1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

CEMCO, LLC,

CASE NO. 23-0918JLR

11

Plaintiff,

ORDER

v.

12

13

KPSI INNOVATIONS, INC., et al.,

Defendants.

14

15

## I.   INTRODUCTION

16

Before the court are five motions:  (1) Plaintiff / Counter-Defendant CEMCO,

17

LLC's ("CEMCO") motion for leave to file an answer (MFL (Dkt. # 138); MFL Reply

18

(Dkt. # 147)); (2) CEMCO's motion for partial summary judgment on Defendants KPSI

19

Innovations, Inc. ("KPSI"), Serina Klein ("Ms. Klein"), Kevin Klein, and James A.

20

Klein's ("Mr. Klein") (collectively, "Defendants") affirmative defenses and

21

counterclaims asserting patent invalidity (CEMCO MSJ (Dkt. # 116); CEMCO MSJ

22

Reply (Dkt. # 136)); (3) Defendants' motion for partial summary judgment on CEMCO's

1   fraudulent transfer claims (Def. MSJ (Dkt. # 112); Def. MSJ Reply (Dkt. # 142)); (4)

2   CEMCO's motion to exclude the testimony of expert James William Jones (Jones Mot.

3   (Dkt. # 118)); Jones Reply (Dkt. # 140)); and (5) Defendants' motion to exclude the

4   testimony of expert Dr. Alan G. Goedde (Goedde Mot. (Dkt. # 114); Goedde Reply (Dkt

5   # 141)).  All motions are opposed.  (*See* MFL Resp. (Dkt. # 145); CEMCO MSJ Resp.

6   (Dkt. # 131); Def. MSJ Resp. (Dkt. # 123); Jones Resp. (Dkt. # 130); Goedde Resp. (Dkt.

7   # 128).)  The court has considered the parties' submissions, the relevant portions of the

8   record, and the applicable law.  Being fully advised,[1] the court GRANTS CEMCO's

9   motion for leave to file an answer, GRANTS CEMCO's motion for partial summary

10  judgment, DENIES Defendants' motion for partial summary judgment, DENIES as moot

11  CEMCO's motion to exclude Mr. Jones's testimony, and DENIES Defendants' motion to

12  exclude Dr. Goedde's testimony.

13                        **II.    BACKGROUND**

14          This case arises out of Mr. Klein's brazen and incessant infringement of

15  CEMCO's intellectual property rights.  CEMCO owns United States Patent Nos.

16  7,681,365 (the "'365 Patent"), 7,841,718 (the "'718 Patent"), 8,136,314 (the "'314

17  Patent"), and 8,151,526 (the "'526 Patent") (collectively, the "Asserted Patents").  (*See*

18  3d Am. Compl. (Dkt. # 69) ¶ 10,Exs. A-D.)  The Asserted Patents "generally claim

19  head-of-wall products that comprise an intumescent strip . . . affixed on a sidewall of a

20  header, wherein the intumescent strip expands in a fire to seal the gap between the header

21

22          [1]  The court concludes that oral argument would not aid in its disposition of these
    motions.  *See* Local Rules W.D. Wash. LCR 7(b)(4).

1    and the ceiling to inhibit the spread of smoke and fire." (*Id.* ¶ 11; *see also* '365 Patent at

2    6:42-8:29; '718 Patent at 10:9-12:22; '314 Patent at 10:20-65; '526 Patent at 7:32-8:46.)

3        Mr. Klein is the sole named inventor on each of the Asserted Patents. (*See*

4    *generally* Asserted Patents.)  He is also a former CEMCO employee. (3d. Am. Compl.

5    ¶ 24; Answer to 3d Am. Compl. (Dkt. # 83) ¶ 24 (admitted).)  In April 2016, after more

6    than three years of litigation in the Central District of California involving CEMCO, Mr.

7    Klein and his company "BlazeFrame," and Ohio-based Clarkwestern Dietrich Building

8    Systems LLC ("ClarkDietrich"), Mr. Klein and BlazeFrame agreed to "assign their

9    BlazeFrame-related patent rights[, including the Asserted Patents,] to CEMCO for the

10   payment of $800,000." (8/20/24 Trojan Decl. (Dkt. # 117) ¶ 11, Ex. 10 at 9.)

11   ClarkDietrich had an exclusive license to use the BlazeFrame patents in 44 states, and

12   Mr. Klein and BlazeFrame were permitted to continue selling products practicing the

13   patents in the other six states. (*Id.* at 9-10.)

14       Four months later, CEMCO and ClarkDietrich sued Mr. Klein and BlazeFrame in

15   the Central District of California for allegedly violating the territorial restrictions set forth

16   in their prior agreement. *See generally* Compl., *Cal. Expanded Metal Prods. Co.*[2] *v.*

17   *Klein*, No. 2:16-cv-05968-DDP-MRW (C.D. Cal. Aug. 10, 2016), Dkt. # 1.  The parties

18   executed a settlement agreement on June 25, 2017, under which Mr. Klein and

19   BlazeFrame gave up the right to make, use, offer for sale, or sell products covered by the

20   patents, and ClarkDietrich became the exclusive licensee in all 50 states. (3d. Am.

21   //

22       [2]  California Expanded Metal Products Co. is affiliated with CEMCO.

1   Compl. ¶ 30; Answer to 3d Am. Compl. ¶ 30 (admitted).)  Shortly thereafter, Mr. Klein

2   started a new company, Safti-Seal, Inc. ("Safti-Seal").  (3d. Am. Compl. ¶ 31; Answer to

3   3d Am. Compl. ¶ 31 (admitted).)

4          In January 2018, CEMCO and ClarkDietrich sued Mr. Klein, BlazeFrame, and

5   Safti-Seal in this District for infringement of the Asserted Patents.  *See generally* Compl.,

6   *Cal. Expanded Metal Prods. Co. v. Klein*, No. C18-0659JLR (W.D. Wash. Jan. 10,

7   2018), Dkt. # 1.  In January 2020, the parties reached a settlement in that case whereby

8   Mr. Klein, BlazeFrame, and Safti-Seal agreed (1) that Safti-Seal's products infringed the

9   Asserted Patents and (2) to be permanently enjoined from infringing the Asserted Patents.

10  *See generally* Stip. Consent Judgment, *Cal. Expanded Metal Prods. Co. v. Klein*, No.

11  C18-0659JLR (W.D. Wash. Jan. 3, 2020), Dkt. # 164.  In March 2020, Mr. Klein's

12  colleagues formed another company, Seal4Safti, Inc. ("S4S"), to, as one of those

13  colleagues put it, "continue doing as we were doing."  9/1/21 Order at 6, *Cal. Expanded*

14  *Metal Prods. Co. v. Klein*, No. C18-0659JLR (W.D. Wash. Sept. 1, 2021), Dkt. # 251.

15  Mr. Klein informed Safti-Seal's customers that the infringing products' names were

16  being changed to "Fire Rated Gasket" ("FRG"), and S4S continued Safti-Seal's business

17  operations without interruption or substantial change.  *Id.* at 7, 21.  In October 2020, the

18  court reopened the case at CEMCO's request to initiate contempt proceedings against Mr.

19  Klein, BlazeFrame, and Safti-Seal for attempting to circumvent the injunction by selling

20  infringing FRG products through S4S.  *See generally* 10/19/20 Order, *Cal. Expanded*

21  *Metal Prods. Co. v. Klein*, No. C18-0659JLR (W.D. Wash. Oct. 19, 2020), Dkt. # 190.

22  //

1     Three weeks after the court reopened this case, S4S sued CEMCO in the Central

2 District of California seeking declaratory judgment of patent noninfringement,

3 unenforceability, and invalidity.  *See generally* Compl., *Seal4Safti, Inc. v. Cal. Expanded*

4 *Metal Prods. Co.*, No. 2:20-cv-10409-MCS-JEM (C.D. Cal. Nov. 13, 2020), Dkt. # 1.

5 CEMCO filed counterclaims for patent infringement and, in May 2022, a jury found that

6 the Asserted Patents were not invalid and that S4S had induced infringement of the

7 Asserted Patents.  (*See generally* 8/20/24 Trojan Decl. ¶ 22, Ex. 21 (verdict form).)

8     In January 2023, after having held Mr. Klein and S4S in contempt, this court

9 awarded CEMCO and ClarkDietrich actual damages in the form of disgorgement of

10 S4S's profits from April 1, 2020 to May 15, 2022.  (*See* 3d Am. Compl. ¶ 45, Ex. F.)

11 The following month, in February 2023, Mr. Klein's wife, Ms. Klein, formed KPSI.  (*Id.*

12 ¶ 51; Answer to 3d Am. Compl. ¶ 51 (admitted).)  Mr. Klein is purportedly an employee

13 of KPSI (Ms. Klein Decl. (Dkt. # 27-1) ¶ 4),[3] and his son, Kevin Klein, is KPSI's

14 "operations manager" (8/20/24 Trojan Decl. ¶ 6, Ex. 5 at 31).  In February 2023, S4S

15 transferred inventory to KPSI for $83,495.99 and also released the Safti-Seal website and

16 trademark to KPSI.  (3d Am. Compl. ¶¶ 59, 71; Answer to 3d Am. Compl. ¶¶ 59, 71

17 (admitted).)  KPSI operates out of the same warehouse space S4S did, and S4S's assets

18 "stayed at the same address" during the transition.  (5/14/24 Trojan Decl. (Dkt. # 87) ¶ 8,

19 Ex. 7 (Kevin Klein Dep.) at 37:17-38:5.)  KPSI also "took over" S4S's customer projects

20 //

21      _____

      [3] The court uses the term "purportedly" with respect to information in Ms. Klein's
22 declaration because the court has already found evidence that Ms. Klein perjured herself in that
declaration.  (*See* 8/13/24 Order (Dkt. # 111) at 9.)

1   "and continued to supply those jobs."  (8/20/24 Trojan Decl. ¶ 31, Ex. 30 (Sydry Dep.) at

2   55:17-20.)  When interacting with customers, Mr. Klein continued to use "Safti-Seal" in

3   his email address and signature block.  (*See* 5/8/24 Trojan Decl. (Dkt. # 85) ¶ 28, Ex. 18.)

4          In June 2023, CEMCO filed this action alleging patent infringement against KPSI,

5   Mr. Klein, Ms. Klein, and Kevin Klein—this time without ClarkDietrich as a co-plaintiff.

6   (*See generally* Compl. (Dkt. # 1); *see also* 1/29/24 Order (Dkt. # 62) at 12 (concluding

7   that Defendants had "failed to meet their burden under Rule 19(b) to demonstrate that

8   ClarkDietrich is an indispensable party.").)  In its operative complaint, CEMCO sues

9   Defendants for induced patent infringement and the fraudulent transfer of assets.  (*See*

10  *generally* 3d Am. Compl.)

11         CEMCO struggled to obtain discovery from Defendants.  (*See* 8/13/24 Order at 2

12  (noting that Defendants were "nearly five months late" in responding to CEMCO's

13  requests for production despite CEMCO's numerous follow-ups).)  Due to Defendants'

14  discovery delays, the court was forced to move the trial date and ordered Defendants to

15  produce all responsive documents and supplement their interrogatory responses by June

16  14, 2024.  (6/4/24 Order (Dkt. # 99) at 2.)  The court informed Defendants that they

17  "risk[ed] inviting the ire of the court" if they failed to comply and warned of the

18  possibility of "severe sanctions," including "case-dispositive sanctions."  (*Id.*)

19         After the June 14, 2024 deadline passed, CEMCO filed a motion for sanctions

20  because Defendants failed to produce certain instructional videos KPSI created for its

21  customers.  (Sanctions Mot. (Dkt. # 104).)  Upon reviewing the videos, the court agreed

22  with CEMCO that Defendants should have produced them.  (8/13/24 Order at 9.)  Indeed,

1   one video demonstrated the installation of FRG tape on header tracks—conduct expressly

2   forbidden by the January 2020 injunction.  (*See* 7/8/24 Trojan Decl. (Dkt. # 105) ¶ 17.)

3   The court found that Defendants had willfully and in bad faith violated its prior order by

4   failing to produce the videos and that CEMCO had been severely prejudiced by

5   Defendants' extensive discovery misconduct.  (8/13/24 Order at 10.)  As such, the court

6   partially granted CEMCO's request for dispositive sanctions by (1) entering default

7   against Defendants with respect to CEMCO's claims for induced patent infringement in

8   violation of 35 U.S.C. § 271(b); (2) striking Defendants' affirmative defenses except for

9   numbers 10 and 11 concerning patent validity; and (3) striking Defendants'

10  counterclaims to the extent that they sought declaratory judgment of non-infringement.

11  (*Id.* at 12.)

12      Each side timely filed a motion for partial summary judgment and a motion to

13  exclude certain expert testimony.  CEMCO moves for summary judgment on Defendants'

14  remaining affirmative defenses and counterclaims concerning patent validity and also

15  seeks to exclude the testimony of Defendants' technical expert, Mr. Jones.  (*See generally*

16  CEMCO MSJ; Jones Mot.)  Because CEMCO "missed calendaring the deadline for

17  answering Defendants' answer and counterclaims due to a clerical oversight," CEMCO

18  also moves for leave to file an answer.  (2d 9/17/24 Trojan Decl. (Dkt. # 139) ¶ 2.  *See*

19  *generally* MFL.)  Defendants move for summary judgment on CEMCO's claims for the

20  fraudulent transfer of assets and seek to exclude the testimony of CEMCO's damages

21  expert, Dr. Goedde.  (*See generally* Def. MSJ; Goedde Mot.)  The parties' motions are

22  now ripe for consideration.

1
### III.    MOTION FOR LEAVE TO FILE ANSWER

2       CEMCO seeks leave to file a late answer so that it may assert an assignor estoppel

3  defense to Defendants' patent invalidity counterclaims and affirmative defenses.  (*See*

4  *generally* MFL.)  The court grants CEMCO's motion.

5       Federal Rule of Civil Procedure 6(b) provides that, "[w]hen an act may or must be

6  done within a specified time, the court may, for good cause, extend the time . . . on

7  motion made after the time has expired if the party failed to act because of excusable

8  neglect."  Fed. R. Civ. P. 6(b)(1).  "This rule, like all the Federal Rules of Civil

9  Procedure, '[is] to be liberally construed to effectuate the general purpose of seeing that

10  cases are tried on the merits.'"  *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253,

11  1258-59 (9th Cir. 2010) (quoting *Rodgers v. Watt*, 722 F.2d 456, 459 (9th Cir. 1983)).

12  District courts apply a four-factor test in determining whether delay is due to excusable

13  neglect:  "(1) the danger of prejudice to the opposing party; (2) the length of the delay

14  and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether

15  the movant acted in good faith."  *Perez-Denison v. Kaiser Found. Health Plan of the Nw.*,

16  868 F. Supp. 2d 1065, 1078 (D. Or. 2012) (quoting *Bateman v. U.S.P.S.*, 231 F.3d 1220,

17  1223-24 (9th Cir. 2000)).  "Although inadvertence, ignorance of the rules, or mistakes

18  construing the rules do not usually constitute 'excusable' neglect, it is clear that

19  'excusable neglect' under Rule 6(b) is a somewhat 'elastic concept' and is not limited

20  strictly to omissions caused by circumstances beyond the control of the movant."

21  *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 392 (1993)

22  (footnotes omitted).

1    Having considered the relevant factors, the court finds that CEMCO's failure to

2  file an answer was the result of excusable neglect and that good cause exists to grant

3  CEMCO leave to file its answer.

4    The first factor, prejudice to Defendants, weighs heavily in CEMCO's favor.

5  CEMCO made no attempt to hide the ball from Defendants.  Indeed, CEMCO disclosed

6  its assignor estoppel argument months ago in a motion to strike (MTS (Dkt. # 86) at 4),

7  which the court denied without prejudice to allow CEMCO to raise the argument in a

8  later motion for summary judgment (6/12/24 Order (Dkt. # 103) at 5).  That is exactly

9  what CEMCO did.  (*See generally* CEMCO MSJ.)

10    The second factor, the length of delay and its potential impact on the proceedings,

11  is neutral.  The length of delay is considerable.  CEMCO's answer was due on June 26,

12  2024—14 days after the court denied its motion to strike.  (*See* 6/12/24 Order); Fed. R.

13  Civ. P. 12(a)(4)(A).  The impact on the proceedings, however, is *de minimis*.  CEMCO's

14  failure to file a timely answer has not—and will not—impact any deadlines in this matter

15  or otherwise negatively impact these proceedings in any other way.

16    The third factor, the reason for the delay, is again neutral.  CEMCO candidly

17  acknowledges that its counsel "missed calendaring the deadline for answering

18  Defendants' answer and counterclaims due to a clerical oversight."  (MFL at 1.)

19  CEMCO should have filed a timely answer, but the court recognizes that this is an

20  extraordinary case in which CEMCO's answer was due at the tail end of a discovery

21  battle that left CEMCO with just a few weeks to review tens of thousands of pages of

22  documents and prepare opening expert reports.  (*See* 6/4/24 Order at 2 (ordering

1    Defendants to produce all responsive documents by June 14, 2024); *see also* 8/13/24

2    Order at 10-12 (issuing dispositive sanctions against Defendants due to their "extensive

3    discovery misconduct").)

4          The fourth factor, whether CEMCO acted in good faith, weighs in CEMCO's

5    favor.  As discussed above, CEMCO's assignor estoppel argument is not an

6    eleventh-hour defense sprung at the last moment to catch Defendants off guard.  To the

7    contrary, CEMCO showed its hand months ago, and the court detects no bad faith

8    conduct from CEMCO.

9          In sum, two of the relevant factors weigh in CEMCO's favor while two factors are

10   neutral.  The court therefore finds that CEMCO's failure to file a timely answer was the

11   result of excusable neglect and that there is good cause to grant CEMCO leave to file an

12   answer.  CEMCO shall file its answer by no later than October 11, 2024.  Because the

13   parties have fully briefed CEMCO's assignor estoppel argument, the court considers the

14   parties' motions for summary judgment in the present order, instead of waiting until after

15   CEMCO files its answer.

16                    **IV.   MOTIONS FOR SUMMARY JUDGMENT**

17         CEMCO moves for summary judgment on Defendants' affirmative defenses and

18   counterclaims concerning invalidity of the Asserted Patents.  (*See generally* CEMCO

19   MSJ.)  Defendants move for summary judgment on CEMCO's fraudulent transfer claims.

20   (*See generally* Def. MSJ.)   The court first provides the relevant legal standard before

21   considering the parties' motions for summary judgment.

22   *//*

1   **A.   Summary Judgment Legal Standard**

2        Summary judgment is appropriate if the evidence viewed in the light most

3   favorable to the non-moving party shows "that there is no genuine dispute as to any

4   material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

5   56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" if it

6   might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

7   (1986).  A factual dispute is "'genuine' only if there is sufficient evidence for a

8   reasonable fact finder to find for the non-moving party."  *Far Out Prods., Inc. v. Oskar*,

9   247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

10       The moving party bears the initial burden of showing there is no genuine dispute

11  of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at

12  323.  If the moving party does not bear the ultimate burden of persuasion at trial, it can

13  show the absence of such a dispute in two ways:  (1) by producing evidence negating an

14  essential element of the nonmoving party's case, or (2) by showing that the nonmoving

15  party lacks evidence of an essential element of its claim or defense.  *Nissan Fire &*

16  *Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the moving party

17  meets its burden of production, the burden then shifts to the nonmoving party to identify

18  specific facts from which a factfinder could reasonably find in the nonmoving party's

19  favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

20  **B.   CEMCO's Motion for Summary Judgment**

21       CEMCO argues that it is entitled to summary judgment on Defendants'

22  affirmative defenses and Kevin Klein and KPSI's counterclaims "because there is no

1    genuine issue of material fact that the Defendants are barred by the doctrine of assignor

2    estoppel from asserting that the [Asserted Patents] . . . are invalid." (CEMCO MSJ at 1.)

3    Defendants respond with two arguments.  First, Defendants argue that assignor estoppel

4    does not apply in this case "because CEMCO hasn't demonstrated [Mr.] Klein made

5    conflicting representations" when he assigned the patents, as required by the Supreme

6    Court's opinion in *Minerva Surgical, Inc. v. Hologic, Inc.*, 594 U.S. 559 (2021).

7    (CEMCO MSJ Resp. at 18 (capitalization altered).)  Second, Defendants argue that KPSI

8    and Kevin Klein are not in privity with Mr. Klein, meaning the assignor estoppel doctrine

9    cannot bar them from arguing that the Asserted Patents are invalid.[4] (*Id.* at 14.)  The

10    court agrees with CEMCO.

11          1.     Assignor Estoppel Legal Standard

12          Assignor estoppel is a doctrine "rooted in an idea of fair dealing[ that] limits an

13    inventor's ability to assign a patent to another for value and later contend in litigation that

14    the patent is invalid." *Minerva Surgical*, 594 U.S. at 563.  The doctrine applies "only

15    when its underlying principle of fair dealing comes into play." *Id.* at 576.  In other

16    words, the doctrine applies when an assignor implicitly or explicitly "warrants that a

17    patent is valid" but later argues that the same is invalid.  *See id.*  In such a situation, the

18    "later denial of validity breaches norms of equitable dealing." *Id.*  "But when the

19    assignor has made neither explicit nor implicit representations in conflict with an

---

[4]  With respect to privity, Defendants' brief focuses almost exclusively on Kevin Klein but notes that "KPSI is arguably a closer call." (CEMCO MSJ Resp. at 14.)  Because Defendants do not concede that KPSI is in privity with Mr. Klein, the court analyzes privity with respect to both KPSI and Kevin Klein.

1    invalidity defense, then there is no unfairness in its assertion[, a]nd so there is no ground

2    for applying assignor estoppel." *Id.*

3        Assignor estoppel applies to those in privity with the assignor. *Mag Aerospace*

4    *Indus., Inc. v. B/E Aerospace, Inc.*, 816 F.3d 1374, 1379-80 (Fed. Cir. 2016). "Privity,

5    like the doctrine of assignor estoppel itself, is determined upon a balance of the equities."

6    *Shamrock Techs., Inc. v. Med. Sterilization, Inc.*, 903 F.2d 789, 793 (Fed. Cir. 1990).

7    The "closer th[e] relationship" is between the assignor and the other party, "the more the

8    equities will favor applying the doctrine" to the other party. *Id.* "What is significant is

9    whether the ultimate infringer availed itself of the inventor's 'knowledge and assistance'

10   to conduct infringement." *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 839

11   (Fed. Cir. 1991) (collecting cases); *see also L-3 Commc'ns v. Jaxon Eng'g & Maint.,*

12   *Inc.*, 69 F. Supp. 3d 1136, 1142 (D. Colo. Sept. 22, 2014) (finding privity between

13   assignors and "the founders, majority shareholders, and officers" of the new company

14   and noting that "[i]t would hardly be logical to preclude [the new company] from

15   contesting invalidity, but to allow its officers to do so as individuals").

16       The court first considers whether Mr. Klein, as the assignor, made conflicting

17   representations regarding the validity of the Asserted Patents, and then determines

18   whether he is in privity with KPSI and Kevin Klein.[5]

19   //

20

21       [5] Although it is not clear to the court whether Ms. Klein is asserting an invalidity
affirmative defense, the court concludes that, to the extent she is doing so, she is barred by the
doctrine of assignor estoppel because she is in privity with Mr. Klein. *See L-3 Commc'ns*, 69 F.
22   Supp. 3d at 1142.

1          2.    <u>Whether Mr. Klein Made Conflicting Representations</u>

2        The court has little difficulty concluding as a matter of law that Mr. Klein has

3 made conflicting representations with respect to the validity of the Asserted Patents.  In

4 prior litigation that took place before CEMCO acquired the Asserted Patents, Mr. Klein

5 (1) explicitly denied that several of the "BlazeFrame" patents were invalid, *see* Klein

6 Answer ¶¶ 68, 90, 112, *Cal. Expanded Metal Prods. Co. v. Clarkwestern Dietrich*

7 *Building Sys., LLC*, No. 2:12-cv-10791-DDP-MRW (C.D. Cal. Sept. 17, 2014), Dkt.

8 # 118; (2) criticized CEMCO for "reject[ing] Klein's offers to license the header-track

9 technology," *id.* at 26; and (3) submitted a declaration describing his conception of a

10 "new fire retardant header track." 8/7/15 Klein Decl. ¶ 35, *Cal. Expanded Metal Prods.*

11 *Co. v. Clarkwestern Dietrich Building Sys., LLC*, No. 2:12-cv-10791-DDP-MRW (C.D.

12 Cal. Aug. 7, 2015), Dkt. # 443.[6]  To resolve that litigation, "[Mr.] Klein and BlazeFrame

13 [agreed to] assign their BlazeFrame-related patent rights[, including the Asserted

14 Patents,] to CEMCO for the payment of $800,000."  (8/20/24 Trojan Decl. Ex. 10 at 9

15 (transcript of settlement conference in C.D. Cal. case No. 12-10791).)  By now arguing

16 that the Asserted Patents are invalid—and therefore worthless—Mr. Klein clearly takes a

17 position conflicting with his prior representations.  Thus, assignor estoppel bars Mr.

18 Klein and those in privity with him from arguing that the Asserted Patents he sold to

19 CEMCO are now invalid.

20 //

21

22      [6]  To the extent it must, the court takes judicial notice of these documents pursuant to Federal Rule of Evidence 201.

ORDER - 14

3.     <u>Whether KPSI and Kevin Klein are in Privity with Mr. Klein</u>

The court likewise has little difficulty concluding that KPSI and Kevin Klein are in privity with Mr. Klein.

i.     *KPSI*

To assist it in determining whether an assignor is in privity with a corporate entity, this court looks to the "*Shamrock* factors." *See Cal. Expanded Metal Prods. Co. v. Klein*, No. C18-0659JLR, 2018 WL 6249793, at *4 (Nov. 28, 2018).  The factors include:

> (1) the assignor's leadership role at the new employer; (2) the assignor's ownership stake in the defendant company; (3) whether the defendant company changed course from manufacturing non-infringing goods to infringing activity after the inventor was hired; (4) the assignor's role in the infringing activities; (5) whether the inventor was hired to start the infringing operations; (6) whether the decision to manufacture the infringing product was made partly by the inventor; (7) whether the defendant company began manufacturing the accused product shortly after hiring the assignor; and (8) whether the inventor was in charge of the infringing operation.

*Mag Aerospace*, 816 F.3d at 1380.

**First**, there is no genuine dispute that Mr. Klein plays a significant leadership role at KPSI.  Mr. Klein purports to be a mere employee of or, sometimes, a "consultant to KPSI." (8/20/24 Trojan Decl. ¶ 4, Ex. 3 at 41.)  Between April and July 2023, however, Mr. Klein signed over 400 engineering judgments on behalf of KPSI that listed his title as "Director of Technical Services."  (*Id.* ¶ 37).  Mr. Klein designs and fire tests KPSI's products.  (*Id.* ¶ 7, Ex. 6 (Ms. Klein Dep.) at 81:23-82:2.)  He is the only person who signs the engineering judgments for KPSI.  (*Id.* at 10:17-11:8.)  He interacts with KPSI's customers by taking orders, sending tracking information, and coordinating billing. (5/8/24 Trojan Decl. Ex. 18.)  He travels on behalf of KPSI for sales calls and to attend

1   trade shows.  (8/20/24 Trojan Decl. ¶ 8, Ex. 7 (Kevin Klein Dep.) at 24:1-4; *id.* ¶ 30, Ex.

2   29 (Mr. Klein Dep.) at 13:5-9.)  He even co-starred in and shared videos demonstrating

3   KPSI's products.  (7/8/24 Trojan Decl. ¶ 2, Ex. 1; *id.* ¶ 16, Ex. 10.)  There is no genuine

4   dispute that Mr. Klein is one of KPSI's key leaders.

5          **Second**, there is no genuine dispute that Mr. Klein is the *de facto* owner of KPSI.

6   Although Defendants argue that Mr. Klein "has no legal right to control" KPSI (CEMCO

7   MSJ Resp. at 8), they offer no evidence or argument in response to CEMCO's assertions

8   that KPSI is Mr. Klein's "latest corporate disguise" and that Ms. Klein "is merely its

9   figurehead" (CEMCO MSJ at 4; *see generally* CEMCO MSJ Resp.).  Plenty of evidence

10  exists, however, to support CEMCO's assertions.  For example, in March 2024, Ms.

11  Klein was not sure whether KPSI had a board of directors and testified that the company

12  had not been observing corporate formalities, such as holding annual meetings.  (5/14/24

13  Trojan Decl. ¶ 7, Ex. 6 (Ms. Klein Dep.) at 58:12-23.)  Ms. Klein also did not appear to

14  understand the scope of KPSI's inventory or what KPSI could lawfully sell without

15  infringing CEMCO's patent rights.  (*See id.* at 34:4-14.)  Worst of all is the undisputed

16  fact that Mr. Klein formed yet another entity—JAK Innovations—that received hundreds

17  of thousands of dollars from KPSI to pay debts Mr. Klein personally owed to CEMCO

18  and ClarkDietrich.  (*Id.* at 88:7-10 ("Q. Well, did any of the money that Jim Klein has

19  paid to CEMCO come out of the KPSI account?  A. JAK Innovations did borrow money

20  from KPSI, yes.").)  Mr. Klein hides behind a tattered corporate veil.  Although Mr.

21  Klein is not KPSI's owner on paper, there is no genuine dispute that he behaves like the

22  owner.

1        **Third**, there is no genuine dispute that KPSI took over S4S's infringing

2   operations.  KPSI was formed in February 2023 (*id.* at 5:21-24), after a jury in the

3   Central District of California found that S4S had induced infringement of the Asserted

4   Patents and Judge Scarsi ordered S4S to pay California Expanded Metal Products Co.

5   over $575,000 in attorneys' fees and costs.  (8/20/24 Trojan Decl., Ex. 21 (verdict form).)

6   *See generally* Order, *Seal4Safti, Inc. v. Cal. Expanded Metal Prods. Co.*, No. 2:20-cv-

7   10409-MCS-JEM (C.D. Cal. Jan. 25, 2023), Dkt. # 318.  KPSI acquired S4S's assets,

8   including its website and trademarks, and operates in the same space S4S once did.

9   (8/20/24 Trojan Decl. ¶ 31, Ex. 30 at 34-35, 39, 89.)  KPSI also "took over all of the jobs

10  that Seal4Safti had and continued to supply those jobs[.]"  (*Id.* at 55.)  Even when

11  interacting with customers, Mr. Klein still uses "Safti-Seal" in his email address and

12  signature block.  (5/8/24 Trojan Decl. Ex. 18.)  Defendants' attempts to separate KPSI

13  from Mr. Klein and his previous companies fail to create a genuine dispute of material

14  fact.  KPSI is effectively operating as S4S.

15       The court considers the **fourth** and **eighth** factors together.  There is no genuine

16  dispute that Mr. Klein provides customer training and, as "Director of Technical

17  Services" for KPSI, signs off on engineering judgments—both of which are related to the

18  induced infringement of the Asserted Patents.  As the court already determined,

19  Defendants produced "videos that show Mr. Klein installing FRG tape on header tracks."

20  (8/13/24 Order at 9.)  Moreover, a superintendent for one of KPSI's customers testified

21  that Mr. Klein provided a live training session in June 2023 in which Mr. Klein taught

22  them how to install "Safti-Seal strip" "over the top of [their wall] track."  (8/20/24 Trojan

Decl. ¶ 33, Ex. 32 (Murphy Dep.) at 12:12-19.)  The superintendent testified that Mr.

Klein "got up on the bench, installed a piece of the tape for us, and showed us exactly

how it's supposed to lap onto the concrete, be nice and tight onto [the] track."  (*Id.* at

12:19-22; *see also id.* at 13:2-5 ("[Mr. Klein] actually installed it himself, and then we

got up and also installed it, and then he watched us as we installed it to make sure we

were doing it like he showed us.").)  Moreover, as discussed above, Mr. Klein signed off

as KPSI's Technical Director on more than 400 engineering judgments—one of which

referred to "FRG on Bracing Angle at Head of Wall[.]"  (8/20/24 Trojan Decl. ¶ 37.)

There is simply no genuine dispute of material fact that Mr. Klein plays a significant

leadership role with respect to KPSI's induced infringement of the Asserted Patents.

The court considers the **fifth** and **seventh** factors together, as well.  This is not a

situation in which Mr. Klein was hired to start the infringing operations, but rather one in

which Mr. Klein's former company, found liable for induced infringement of the

Asserted Patents, superficially closed up shop and sold all of its assets to a new

company—KPSI.  As discussed above, Mr. Klein continues to work with the same

customers and continues to unlawfully instruct his customers how to install FRG tape in

an infringing manner.  To the extent KPSI "hired" Mr. Klein, there is no genuine dispute

that Mr. Klein plays a significant role in inducing KPSI's customers to infringe the

Asserted Patents—inducement which began as soon as KPSI took over S4S's projects.

Finally, the court considers the **sixth** factor.  The court agrees with CEMCO that

there is no genuine dispute that KPSI is a continuation of Mr. Klein's former business

ventures.  Ms. Klein admitted that she is not involved in decisions concerning the

1    products KPSI sells.  (*Id.* Ex. 6 at 9.)  As discussed above, Mr. Klein takes and fulfills

2    orders, travels to customer sites, and instructs customers how to install FRG tape on

3    header tracks.  Despite numerous sanctions, orders to pay attorneys' fees and costs, and a

4    permanent injunction, Mr. Klein continues to violate CEMCO's patent rights.  There is

5    no genuine dispute that the decision to continue manufacturing and selling FRG products

6    was Mr. Klein's, just as it has always been.

7          In sum, each *Shamrock* factor weighs in favor of a finding that KPSI is in privity

8    with Mr. Klein.  The court concludes as a matter of law that KPSI is in privity with Mr.

9    Klein and, therefore, is barred by the doctrine of assignor estoppel from contending that

10   the Asserted Patents are invalid.  This game of whack-a-mole must come to an end.  Mr.

11   Klein cannot continue to use corporate disguises to challenge CEMCO's patent rights.

12   The court next considers whether Kevin Klein is also in privity with Mr. Klein.

13              ii.    *Kevin Klein*

14         In determining whether Kevin Klein is in privity with Mr. Klein, the court

15   considers Kevin Klein's relationship with KPSI and evaluates whether Kevin Klein avails

16   himself of Mr. Klein's knowledge and assistance to induce infringement of the Asserted

17   Patents.  *See Intel Corp.*, 946 F.2d at 839.  The court concludes that Kevin Klein is in

18   privity with his father.

19         First, there is no genuine dispute that Kevin Klein plays a significant role at KPSI

20   to assist the company and his father in inducing infringement of CEMCO's patents.  In

21   April 2023, Mr. Klein submitted a declaration swearing that "KPSI's owners are [his]

22   spouse, Serina Klein, and [his] son, Kevin Klein."  (8/20/24 Trojan Decl. ¶ 34, Ex. 33.)

Although Defendants' responses to CEMCO's interrogatories indicated that Kevin Klein "does not own any interest in KPSI," that same response states that Kevin Klein "is KPSI's operations manager" and "is in charge of daily operations including managing the manufacturing of KPSI products, receiving, entering, and shipping of sales orders, [and] receiving of purchase orders[.]" (*Id.* ¶ 6, Ex. 5 at 31.)  Kevin Klein also testified that he oversees another employee at KPSI who "rolls FRG tape for me." (5/14/24 Trojan Decl. Ex. 7 (Kevin Klein Dep.) at 31:25-32:1.)  At the very least, Kevin Klein oversees the manufacture of a key product used in KPSI's customers' infringement of the Asserted Patents as part of his role as operations manager.

Second, there is no genuine dispute that Kevin Klein avails himself of Mr. Klein's knowledge and assistance with respect to KPSI's business.  Mr. Klein testified that he "inten[ds]" "to pass [the business] on" to Kevin Klein and that KPSI was "set up for" Kevin's benefit.  (1st 9/17/24 Trojan Decl. (Dkt. # 137) ¶ 3, Ex. 37 (Mr. Klein Dep.) at 51:9-12, 19-24.)  Mr. Klein explained that he "ha[s] been handing off more . . . responsibilities to Kevin to do the operation side" and has also "been sharing more of the fire-stopping design with . . . Kevin." (*Id.* at 12:1-8.)  Mr. Klein further testified that he "provide[s] [Kevin] with training," such as developing new products, and "encourage[s] him" to "expand[] his skill set to include manufacturing." (*Id.* at 49:9-11, 52:23-53:2.)  When asked whether Mr. Klein was "training [Kevin] with respect to things like engineering judgments" "in order for him to take over," Mr. Klein responded "[n]ot yet" and emphasized that Kevin Klein "needs to do several trips with me to the fire test lab to learn about the process, the certification, . . . how things are tested[.]" (*Id.* at 52:3-9.)

1  Although Mr. Klein testified that he had not yet started taking Kevin Klein on trips or to

2  the fire lab, he noted that he may begin doing so in 2025.  (*See id.* at 10-14.)  Mr. Klein

3  agreed that Kevin Klein is the "natural successor" after he retires.  (*Id.* at 51:15-18.)

4         In light of the undisputed facts discussed above, the court concludes that Kevin

5  Klein is in privity with his father.  Mr. Klein intends for Kevin Klein to take over the

6  family business.  Kevin Klein already plays a significant role in KPSI's operations, and

7  Mr. Klein has been training him to take over more significant aspects related to fire

8  stopping in the future.  Kevin Klein therefore avails himself of his father's knowledge

9  with respect to KPSI's business.  Accordingly, the court concludes as a matter of law that

10 Kevin Klein is in privity with Mr. Klein and therefore is barred by the doctrine of

11 assignor estoppel from contending that the Asserted Patents are invalid.

12        Because there is no genuine dispute that (1) Mr. Klein has made conflicting

13 representations with respect to the Asserted Patents' validity and (2) KPSI and Kevin

14 Klein are in privity with Mr. Klein, the doctrine of assignor estoppel bars Defendants

15 from asserting patent invalidity defenses in this case as a matter of law.  The court

16 therefore grants CEMCO's motion for summary judgment on Defendants' affirmative

17 defenses and counterclaims concerning invalidity.[7]

18 //

19

20     [7] To clarify, this holding also bars Defendants from arguing that the Asserted Patents are
   invalid or enforceable as a result of alleged inequitable conduct.  *See Shamrock*, 903 F.2d at
   794-95 ("reject[ing] the contention that mere classification of a defense as equitable bars
21 consideration of assignor estoppel"); *cf. Synopsys, Inc. v. Magma Design Automation, Inc.*, No.
   C-04-3923 MMC, 2007 WL 420184, at *5 (N.D. Cal. Feb. 6, 2007) ("Magma cannot conduct an
   end-run around assignor estoppel by disguising its invalidity arguments as an unclean hands
22 defense." (internal quotations omitted)).

1    **C.    Defendants' Motion for Summary Judgment**

2        Defendants argue that they are entitled to summary judgment on CEMCO's claims

3    for the fraudulent transfer of assets because the $83,495.99 they paid for the transfer of

4    assets from S4S to KPSI was a "reasonably equivalent value" for those assets within the

5    meaning of Washington's Uniform Voidable Transactions Act ("UVTA").  (Def. MSJ at

6    1.)  CEMCO responds that there is a genuine issue of material fact as to whether S4S's

7    asset transfer to KPSI was for reasonably equivalent value.  (*See generally* Def. MSJ

8    Resp.)  The court agrees with CEMCO.

9        1.    Reasonably Equivalent Value

10       The UVTA provides state law causes of action to creditors to recover fraudulent

11   transfers of money and other types of property.  *See* RCW 19.40 *et seq.*  Separate causes

12   of action exist to remedy "actual" and "constructive" fraud.  *See Vaughn v. Cohen*, No.

13   C23-6142TMC, 2024 WL 4291464, at *5-6 (W.D. Wash. Sept. 25, 2024) (separately

14   analyzing claims for constructive and actual fraud under the UVTA).  In evaluating

15   claims to remedy actual and constructive fraud under the UVTA, the court considers

16   whether the transferor of assets received reasonably equivalent value in exchange for

17   those assets.  *See id.*; *see also* RCW 19.40.041(1)(b), (2).  "Fair consideration is given"

18   when the amount provided is "a fair equivalent therefor" or is "not disproportionately

19   small as compared with the value of the property . . . obtained."  *Osawa v. Onishi*, 206

20   P.2d 498, 504 (Wash. 1949).  Fair consideration "must be determined from the standpoint

21   of creditors," as "[t]he debtor might be satisfied to give his assets to a stranger or to

22   //

ORDER - 22

1  exchange them for some worthless chattel[, b]ut the law will not permit him to do so if he

2  thereby renders himself uncollectible to the detriment of his creditors." *Id.*

3        2.    <u>S4S's Transfer of Assets to KPSI</u>

4        Genuine issues of material fact exist as to whether KPSI's $83,495.99 payment to

5  S4S constitutes reasonably equivalent value for the transferred assets for at least four

6  reasons:  (1) KPSI received but did not pay for S4S's former website, which may be

7  valuable to KPSI; (2) KPSI's payment was for the "cost" price of certain materials and

8  may not have been fair given that the "retail" price of those materials was hundreds of

9  thousands of dollars more; (3) CEMCO has identified $58,183.67 in "missing" inventory

10  which KPSI may have acquired without paying for; and (4) KPSI may have acquired

11  $133,555.04 worth of inventory that S4S purchased after February 14, 2023—the date of

12  the asset transfer.  (Answer to 3d Am. Compl. ¶ 71 (admitted).)

13        First, CEMCO provides evidence that Mr. Klein "took possession and control of

14  S4S's former website" but that neither he nor KPSI paid for it.  (*See* 9/10/24 Trojan Decl.

15  (Dkt. # 124) ¶ 12, Ex. 10 at 15.)  The website contains contact information, product

16  images and descriptions, and lists current projects.  (*See* 8/20/24 Trojan Decl. ¶ 25, Ex.

17  24.)  Defendants do not respond to CEMCO's arguments concerning KPSI's acquisition

18  or use of the website (*see generally* Def. MSJ Reply), and a reasonable factfinder could

19  conclude that the website is valuable.

20        Second, CEMCO provides evidence that KPSI's payment was for the "cost" value

21  of certain assets but that the retail value was "on average 5.95 times higher."  (9/10/24

22  Trojan Decl. ¶ 51.)  Defendants argue that the "raw-good cost" is the only appropriate

1   measure (Def. MSJ Reply at 9), but the court does not agree.  Given that the assets could

2   potentially be sold for hundreds of thousands of dollars more than KPSI paid for them, a

3   reasonable factfinder could conclude that KPSI did not provide reasonably equivalent

4   value in exchange for the transferred assets.

5          Third, CEMCO has identified $58,183.67 in "missing" S4S inventory.  (9/10/24

6   Trojan Decl. ¶ 58.)  Defendants do not respond to CEMCO's argument concerning these

7   purportedly missing assets.  (*See generally* Def. MSJ Reply.)  Given that KPSI took over

8   S4S's warehouse space, a genuine dispute exists as to whether KPSI acquired these assets

9   without providing value in exchange for them.

10          Fourth, CEMCO provides evidence that S4S purchased $133,555.04 worth of

11   inventory after the asset transfer took place on February 14, 2023.  (9/10/24 Trojan Decl.

12   ¶ 56.)  Again, given that KPSI took over S4S's warehouse space, a reasonable factfinder

13   could conclude that S4S purchased these assets to drain the cash in its accounts and KPSI

14   then acquired the assets without ever having paid for them.

15          Because genuine disputes of material fact exist as to whether KPSI provided a

16   reasonably equivalent value to S4S in exchange for the assets KPSI acquired, the court

17   denies Defendants' motion for summary judgment on CEMCO's claims for the

18   fraudulent transfer of assets.[8]

19   //

20

21          [8] The court declines to consider Defendants' collateral estoppel arguments, which they
     raise for the first time in their reply brief.  (*See* Def. MSJ Reply at 2, 7-8); *see also Bazuaye v.*
22   *I.N.S.*, 79 F.3d 118, 120 (9th Cir. 1996) ("Issues raised for the first time in the reply brief are
     waived.").

1

## V.   MOTIONS TO EXCLUDE EXPERT TESTIMONY

2       The court next considers the parties' motions to exclude certain expert testimony.

3   CEMCO moves to exclude the testimony of Mr. Jones—Defendants' technical expert

4   retained to opine on the Asserted Patents' validity.  (*See generally* Jones Mot.)

5   Defendants move to exclude the testimony of Dr. Goedde, who is CEMCO's damages

6   expert.  (*See generally* Goedde Mot.)  The court denies CEMCO's motion to exclude Mr.

7   Jones's testimony as moot because Defendants are estopped from arguing invalidity in

8   this case.  *See supra* § IV.B.2-3.  Below, the court provides the relevant legal standard

9   before considering Defendants' motion to exclude Dr. Goedde's testimony.

10  **A.   Legal Standard**

11      District court judges serve as gatekeepers to "ensure that any and all scientific

12  testimony or evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell*

13  *Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).  The proponent of expert testimony must

14  demonstrate to the court that it is more likely than not that:

15      (a) the expert's scientific, technical, or other specialized knowledge will help
        the trier of fact to understand the evidence or to determine a fact in issue;
16      (b) the testimony is based on sufficient facts or data;
        (c) the testimony is the product of reliable principles and methods; and
17      (d) the expert's opinion reflects a reliable application of the principles and
        methods to the facts of the case.
18

19  Fed. R. Evid. 702.  When assessing a proffer of expert testimony under Rule 702, "[t]he

20  focus, of course, must be solely on principles and methodology, not on the conclusions

    that they generate."  *Daubert*, 509 U.S. at 594-95.

21

22  //

In patent infringement cases, experts often opine on a "reasonable royalty," which "is what a willing licensor and a willing licensee would have agreed to at a hypothetical negotiation just before the infringement began." *Cal. Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976, 994 (Fed. Cir. 2022); *see* 35 U.S.C. § 284 (requiring damages for patent infringement to be "in no event less than a reasonable royalty for the use made of the invention by the infringer"). To satisfy *Daubert*, "expert testimony opining on a reasonable royalty must 'sufficiently tie the expert testimony on damages to the facts of the case. If the patentee fails to tie the theory to the facts of the case, the testimony must be excluded." *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1349 (Fed. Cir. 2018) (brackets omitted) (quoting *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011)). To "properly tie the reasonable royalty calculation to the facts of the hypothetical negotiation at issue," the Federal Circuit "has sanctioned the use of the *Georgia-Pacific* factors to frame the reasonable royalty inquiry." *LaserDynamics, Inc. v. Quanta Comp., Inc.*, 694 F.3d 51, 60 n.2 (Fed. Cir. 2012) (quoting *Uniloc*, 632 F.3d at 1318). *See generally Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (setting forth 15 factors "relevant, in general, to the determination of the amount of a reasonable royalty for a patent license"). It is not enough to merely "discuss[]" the *Georgia-Pacific* factors; the expert must "explain how [he or] she calculated [the proffered] royalty rate using these factors." *Exmark*, 879 F.3d at 1349. A "superficial recitation of the *Georgia-Pacific* factors, followed by conclusory remarks, [can't] support the jury's verdict." *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012). "[S]ome explanation

1    of both why and generally to what extent [a] particular factor impacts the royalty

2    calculation is needed." *Id.*

3    **B.    Defendants' Motion to Exclude Dr. Goedde's Testimony**

4           Defendants argue that Dr. Goedde's proffered testimony improperly "depends

5    upon assertions about non-party ClarkDietrich that have no foundation and are not

6    admissible." (Goedde Mot. at 3 (capitalization altered).) As best the court can tell,

7    Defendants' argument primarily focuses on the fact that Dr. Goedde "never bothered to

8    ask ClarkDietrich what it would want or do," meaning his opinions are "pure conjecture

9    and unreliable." (*See id.* at 5; Goedde Reply at 1-2 ("Dr. Goedde fed unfounded

10   assertions into *Georgia Pacific* and that yielded unreliable results.").) CEMCO responds

11   that Dr. Goedde "did not need to consult ClarkDietrich directly because he had direct

12   evidence of its past agreements involving Mr. Klein regarding licensing the Asserted

13   Patents." (Goedde Resp. at 3.) The court agrees with CEMCO.

14          A patent owner "may account for the economic position of its affiliates and

15   licensees in a hypothetical negotiation." *Acantha LLC v. DePuy Orthopaedics Inc.*, No.

16   15-C-1257, 2018 WL 11414082, at *3 (E.D. Wis. Apr. 25, 2018) (citing *Astrazeneca AB

17   v. Apotex Corp.*, 985 F. Supp. 2d 452, 496 (S.D.N.Y. 2013), *rev'd on other grounds by*

18   782 F.3d 1324 (Fed. Cir. 2015)). Experts may, for example, "make[] the reasonable

19   presumption that the exclusivity of [a] license . . . has economic value resulting in a

20   higher royalty rate." *Johns Hopkins Univ. v. Alcon Lab'ys, Inc.*, No. 15-525-SLR-SRF,

21   2018 WL 11424700, at *5 (D. Del. Mar. 1, 2018). In determining a reasonable royalty,

22   experts must sometimes consider the perspectives of nonparties. *See, e.g., id.* ("Mr.

1   Napper also properly considered [the nonparty licensee's] expected lost profits from

2   sublicensing a strong competitor in the marketplace."); *cf. GoDaddy.com LLC v. RPost*

3   *Commc'ns Ltd.*, No. CV-14-00126-PHX-JAT, 2016 WL 2643003, at *6 & n.4 (D. Ariz.

4   May 10, 2016) (evaluating expert's opinions on hypothetical negotiation between

5   GoDaddy and nonparty Authentix because Authentix owned the asserted patent at the

6   time of the hypothetical negotiation).  The Federal Circuit has commented that

7   "estimating a 'reasonable royalty' is not an exact science." *Apple Inc. v. Motorola, Inc.*,

8   757 F.3d 1286, 1315 (Fed. Cir. 2014).  Thus, "[w]hen the methodology is sound, and the

9   evidence relied upon sufficiently related to the case at hand, disputes about the degree of

10  relevance or accuracy (above this minimum threshold) may go to the testimony's weight,

11  but not its admissibility." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir.

12  2010).

13          Here, Defendants' criticisms of Dr. Goedde's proffered testimony go to the weight

14  of the evidence, not its admissibility.  Defendants do not argue that Dr. Goedde

15  misapplied any of the *Georgia-Pacific* factors.  (*See generally* Goedde Mot.)  Nor do

16  Defendants argue that anything Dr. Goedde wrote concerning ClarkDietrich was

17  incorrect.  (*See generally id.*)  Instead, Defendants criticize Dr. Goedde for opining about

18  ClarkDietrich without "review[ing] any depositions of ClarkDietrich personnel,

19  communicat[ing] with ClarkDietrich personnel, or ask[ing] ClarkDietrich to supply any

20  fact." (*Id.* at 5.)  The court agrees with Defendants that Dr. Goedde's opinions might be

21  more "reliable" had he considered such materials (*see id.*), but his testimony is not

22  inadmissible simply because he did not do so.

1        Dr. Goedde's opinions concerning ClarkDietrich are sufficiently derived from his

2   experience, education, and review of relevant documents.  For example, in reviewing

3   license agreements among nearly identical parties, Dr. Goedde opines that ClarkDietrich

4   and CEMCO would not settle for less than the previously-agreed-upon 20% royalty rate

5   because granting a license to KPSI would introduce a competitor into the market,

6   "leav[ing] ClarkDietrich vulnerable to competition . . . and loss of market share."

7   (Goedde Rpt. (Dkt. ## 115-1 (redacted), 127 (sealed)) at 7-8 ("ClarkDietrich would

8   require a . . . higher royalty rate to compensate for these deficiencies.").)  Contrary to

9   Defendants' position, Dr. Goedde did not have to ask ClarkDietrich whether post-license

10  price erosion would be "a concern" to ClarkDietrich—it reasonably would be to any

11  company in ClarkDietrich's position.  (*See* Goedde Mot. at 4.)  As Dr. Goedde explains,

12  ClarkDietrich's exclusive license to the Asserted Patents allows it to sell more products

13  and charge more for those products.  (*See* Goedde Rpt. at 10.)  Because Dr. Goedde's

14  opinions concerning ClarkDietrich are reasonably well-founded and grounded in the facts

15  of this case, the court denies Defendants' motion to exclude Dr. Goedde's opinions.[9]

16  //

17  //

18      [9]  Although the court has overruled Defendants' objections to Dr. Goedde's testimony
    concerning ClarkDietrich, the court writes separately to alert CEMCO to a potential issue with
19  Dr. Goedde's ultimate conclusion.  Dr. Goedde's 20% figure is based on a license agreement that
    split the royalty between CEMCO and ClarkDietrich (*see* Goedde Rpt. at 7), but ClarkDietrich is
20  not a party to this case.  CEMCO "may account for the economic position of [ClarkDietrich] in a
    hypothetical negotiation," but it "cannot include the profits [ClarkDietrich] would have earned as
21  part of its own damages calculations."  *Acantha*, 2018 WL 11414082, at *3.  Thus, Dr. Goedde
    may opine that, based on a prior license agreement, Defendants would agree to pay CEMCO and
22  ClarkDietrich a 20% royalty on past sales (as they have essentially done before), but CEMCO
    cannot ask the jury to award it the entire 20% figure.  *See id.*

1

## VI.   CONCLUSION

2          For the foregoing reasons, the court GRANTS CEMCO's motion for leave to file

3   an answer (Dkt. # 138), GRANTS CEMCO's motion for partial summary judgment (Dkt.

4   # 116), DENIES Defendants' motion for partial summary judgment (Dkt. # 112),

5   DENIES as moot CEMCO's motion to exclude Mr. Jones's testimony (Dkt. # 118), and

6   DENIES Defendants' motion to exclude Dr. Goedde's testimony (Dkt. # 114).  The court

7   ORDERS CEMCO to file its answer on the docket by no later than October 11, 2024.

8   Trial will proceed on issues pertaining to (1) damages for Defendants' induced

9   infringement of the Asserted Patents and (2) Defendants' alleged fraudulent transfer of

10  assets.

11         Dated this 9th day of October, 2024.

12

13                                          JAMES L. ROBART
                                            United States District Judge

14

15

16

17

18

19

20

21

22

ORDER - 30